FILED
09/24/2021
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 1, 2021

**IN RE ARTEMAS A., ET AL.**

**Appeal from the Juvenile Court for Benton County**
**No. 2020-JT-2       John W. Whitworth, Judge**

_____

**No. W2021-00058-COA-R3-PT**

_____

This appeal involves a petition to terminate parental rights to four children.  The juvenile court found by clear and convincing evidence that six grounds for termination were proven: (1) abandonment by failure to support; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with the permanency plan; (4) persistent conditions; (5) severe child abuse; and (6) failure to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the children.  The juvenile court also found that termination was in the best interests of the four children.  Only the mother appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Daniel E. King, Camden, Tennessee, for the appellant, Jessica F.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.       FACTS & PROCEDURAL HISTORY**

Jessica F. ("Mother") began her relationship with Christopher A. ("Father") when Mother was 19 years of age.  At that time, Mother moved into the home of Father's parents in Benton County, where she worked as a live-in assistant.  Mother resided in this residence for approximately ten years.  During that time, Artemas, Abriel, and Atticus were born to

Mother and Father. Mother brought her children home from the hospital to this residence and the children resided there with her.

In June 2018, the Department of Children's Services ("DCS") filed a petition in which it alleged that Artemas, Abriel, and Atticus were dependent and neglected. A referral was received in May 2018 for a drug-exposed child, educational neglect, and environmental neglect. The petition alleged that Artemas disclosed that he occasionally missed school because he could not wake Mother and Father up. He further disclosed that there was sometimes not enough food and he would go without food so his little brothers could eat, and that their home did not have water and they had to use the bathroom across the street.

In August 2018, the juvenile court appointed counsel for the parents and a guardian ad litem to represent the interests of the children. Additionally, the juvenile court ordered that Mother and Father were to:

1. cooperate with DCS;
2. supply up-to-date contact information to the case manager for the case;
3. maintain communication with the case manager;
4. obtain an alcohol and drug ("A&D") assessment and follow all recommendations;
5. participate and complete in-home services and follow all recommendations; and
6. ensure that Artemas, Abriel, and Atticus each completed hair follicle drugs screens.

In November 2018, Artemas, Abriel, and Atticus entered DCS custody pursuant to a protective custody order after Atticus tested positive for methamphetamines and Mother and Father failed to comply with court-ordered services. After a hearing in December 2018, the juvenile court adjudicated the children dependent and neglected, and the children remained in DCS custody. Shortly after, Mother and Father moved out of the residence of Father's parents to allow that residence to be a potential placement for the children. Mother and Father moved to a trailer park and remained there until being evicted in July 2019.

In December 2018, Mother gave birth to her fourth child, Aye. In February 2019, DCS filed a petition for dependency and neglect regarding Aye after Mother and Father failed urine drug screens and continued to be uncooperative with court-ordered services. Mother, Father, and Aye completed hair follicle drug screens in April 2019. Mother tested positive for amphetamines and methamphetamines. Aye tested positive for methamphetamines and THC. In April 2019, when Aye was four months old, he entered DCS custody pursuant to a court order. In June 2019, the juvenile court found that there was clear and convincing evidence that Aye was dependent and neglected and that Mother and Father had committed severe abuse as to Aye. Therefore, Aye remained in DCS custody.

Anthony Vandusen has been the family service worker for this case the entire time that the children have been in the custody of DCS. During this case, four permanency plans were created and ratified by the juvenile court.[1] In December 2018, Mother participated in the creation of the first permanency plan, was provided with a copy, and signed the plan. Under the first permanency plan, Mother's responsibilities were to:

1. complete an A&D assessment and follow all recommendations;
2. complete a mental health assessment and follow all recommendations;
3. maintain contact with DCS and provide information regarding any changes in address or phone number;
4. sign releases for all service providers so that DCS could monitor her progress and compliance;
5. submit to random drug screens and test negative consistently;
6. submit to a hair follicle drug screen by December 15, 2018;
7. establish and maintain a stable and safe residence that was drug-free for a minimum of four consecutive months and provide proof in the form of rent or utility receipts; and
8. participate in announced and unannounced home visits to check the safety and appropriateness of the home.

Additionally, the permanency plan required Mother to pay $75 per month in child support ($25 per child) and to attend supervised visitation as scheduled.[2] Mother would be responsible for the children's needs during visits and for engaging in positive conversation during the visits. Mother was also provided with and signed the criteria and procedures for termination of parental rights. Through this form, Mother was made aware of the possible grounds for involuntary termination of her parental rights.

In January 2019, Mother completed an A&D assessment which led to a recommendation that she complete intensive outpatient treatment if she failed a random drug screen. After Mother failed a random drug screen, the A&D assessment was revised to recommend inpatient treatment. In March 2019, Mother completed her mental health intake which resulted in a recommendation that she follow up with her primary care provider to resume medications for her ADHD and depression.

In April 2019, the first permanency plan was revised. In addition to the steps in the first permanency plan, the second permanency plan required Mother to:

---

[1] Five permanency plans were developed, but only four permanency plans were ratified by the juvenile court.

[2] The juvenile court entered the child support orders for Artemas, Abriel, and Atticus in January 2019.

1. complete a psychological evaluation with a parenting component and follow all recommendations;
2. attend and successfully complete inpatient treatment per the recommendation from the A&D assessment;
3. follow up with her primary care provider to resume her medications per the recommendation from the mental health assessment;
4. follow up with Tomorrow's Hope to work on communication between Mother and Father; and
5. submit to criminal background checks and random drug screens.

The permanency plan now required Mother to pay $100 per month in child support ($25 per child), which now included her fourth and youngest child, Aye.[3] Additionally, Mother was required to follow up with her primary care provider to resume her medications for ADHD and depression per the recommendation from the mental health intake in March 2019. Despite the permanency plan's recommendation that she attend inpatient treatment in April 2019, Mother did not enter inpatient treatment until July 2020.

On July 11, 2019, Mother completed an intake with Carey Counseling after Mr. Vandusen drove her to that appointment. Mother did not sign a release to allow DCS to obtain these counseling records as required by her permanency plan. Mother completed her psychological evaluation on July 31, 2019. Mr. Vandusen also drove her to that appointment. The evaluation resulted in a recommendation of drug screens in concert with continued participation in A&D treatment, psychotherapy, and supervised visitation with the children until she demonstrated adequate abstinence from alcohol and drugs and made adequate progress in individual therapy. If subsequent drug screens indicated continued drug abuse, the evaluation recommended that inpatient or residential treatment should be considered.

In October 2019, the second permanency plan was revised. In addition to the steps in the second permanency plan, the third permanency plan required Mother to complete the recommendations from the psychological evaluation and resolve the legal charges for severe child abuse and not incur additional charges. In March 2020, the third permanency plan was revised. The fourth permanency plan added the responsibilities of complying with the rules of Mother's probation and submitting to a drug screen by March 31, 2020. The plan also noted resources for Mother as a survivor of domestic violence.

On April 1, 2020, DCS petitioned to terminate the parental rights of Mother and Father to all four children based on abandonment by failure to support; abandonment by failure to provide a suitable home; substantial noncompliance with the permanency plan; persistent conditions; severe child abuse; and failure to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the children. The trial

---

[3] The juvenile court did not enter a child support order for Aye until September 2019.

was held on October 30, 2020.

At trial, Mother testified at length about her substance abuse issues. Mother's mother suffered from drug addiction and was in and out of rehab. Beginning at five years old, Mother was prescribed amphetamines to help treat her ADHD. Mother became addicted to the medication, and when her prescription became unavailable, she used methamphetamine for the first time. At the time of trial, Mother had not possessed a prescription for her medication for approximately three or four years, and was only able to obtain the medication "on the street." Throughout this case, Mother was offered drug screens eighteen different times. Of those drug screens, five were positive, ten were refused, one was negative, and the remaining two were attempted but DCS was unable to establish contact with Mother. Mother admitted that she used methamphetamine throughout the life of this case and that methamphetamine is an illegal substance that is highly addictive and highly dangerous. Mother even stated that she believed her visitation with the children went better when she used methamphetamine versus when she was sober. However, Mother testified that she last used drugs on June 28, 2020.

On June 29, 2020, Mother was arrested for possession of heroin with intent to sell, possession of methamphetamine with intent to sell, simple possession of marijuana, and possession of drug paraphernalia. Mother testified that law enforcement also recovered $30,000 from the motel room from which she was arrested and stated that she was the only person present at the time. In July 2020, Mother entered rehab after being "pushed" by the pending drug charges. Mother acknowledged that she waited a significant period of time before finally entering rehab, but stated that she "didn't want to miss this opportunity this time." At the time of trial, Mother had been sober for four months and hoped to graduate from the rehab program in August 2021. Despite the permanency plan's requirement to follow up with her primary care provider to resume her ADHD medications, Mother stated that she was "completely off of the medication, [she was] completely sober, and [she felt] great." At the time of trial, Mother was not on medication, planned to not be medicated at all, and was not seeing a doctor while in rehab. Although Mother was not on ADHD medication, Mr. Vandusen noted that Mother was "more collected" at trial than she was in the past.

Mother testified that she was a victim of domestic violence by Father and Father's father. As for the children, Mother stated that Father and his father could be hateful to the children. Sometimes Father grabbed or jerked the children in a way Mother did not like. Mother would interfere and "then that would get him on [her]." Mr. Vandusen did not learn of the domestic violence between Father and Mother until Mother disclosed the matter to him in January 2020. It was unclear at trial whether Mother and Father were still together, but Mr. Vandusen believed that they were not based on the information he had.

After Mother moved out of the residence of Father's father, Mother attempted to establish an independent home in a trailer park, but was evicted in July 2019. Mother

moved back to the residence of Father's father, but left after Father became abusive again. Mother then lived independently in an apartment furnished by her employer for a short period of time.[4]  Mr. Vandusen visited that apartment in January 2020 and testified that the home was appropriate.  However, Mother did not provide Mr. Vandusen with rent or utility receipts and Mother did not still have that apartment.  Mother was residing at a rehab facility at the time of trial.  Mother acknowledged that she was not able to take custody or take care of the children at the time of trial because of her enrollment in rehab.

Mother briefly testified about her future plans after she graduates from rehab in August 2021.  Mother hopes to restore her family, go back to college, go to law school, and start her ministry.  Mother plans to save the paychecks that she will receive in her last two months of rehab and use that money to buy a car and a house.  Mother testified that at the time she was unable to say where she would be living after completing rehab.  Mother does not have family to help her or a support system outside of Father's family and DCS's formal support.  Mother's mother was in prison at the time of trial, and Mother's extended family would be unable to help her.

Mr. Vandusen, the family service worker, testified that the conditions that led to the children being placed in DCS custody still existed.  Mr. Vandusen testified that he "never once doubted that either [Mother or Father] love[d] their children."  Mr. Vandusen also recognized that Mother had achieved some of the action steps in the permanency plans: completion of the A&D assessment, the psychological evaluation, and the mental health intake, participation in visitation with the children, and enrollment in inpatient rehab. However, when asked about the desired outcomes of the permanency plan, Mr. Vandusen testified that "the most important thing that needed to be addressed was the substance abuse.  I think any action steps relating to that were most important[.]"

Mr. Vandusen testified regarding his attempts to assist Mother in completion of her responsibilities contained in the permanency plan.  He testified that initially Mother was accepting of the mental health counseling and his offer of transportation, but Mother had "a lot of refusal to go to [drug] treatment."  Mr. Vandusen stated that he "provided a list of residential treatment programs, IOP programs, through text message in April of 2019. [He] also provided a hard copy in June of 2019 as well; had multiple conversations about treatment and offered drug screens consistently at visitations."  However, after the efforts to engage Mother regarding A&D services, Mother remained in denial about her drug addiction.  Mr. Vandusen stated that Mother showed "a lot of hostility and refusal to do drug screens and participate in treatment programs."  In May 2019, Mr. Vandusen attempted to go over the criteria and procedures for termination of parental rights with Mother and Father, but they became agitated, snatched the paperwork out of his hand, and stormed out of the office.  Until she entered rehab in July 2020, Mother was not cooperative

---

[4] Although Mother stated that this apartment was "furnished by her employer," she testified that she did have to pay rent.

with DCS or Mr. Vandusen.

In spite of Mother's enrollment in rehab, Mr. Vandusen concluded that barriers still remained for Mother relating to her substance abuse issues, mental health treatment, residential stability, pending drug charges, and child support obligation. One of those barriers was that Mother would still need to complete rehab. Mother was in rehab and making progress at the time of trial, but her graduation date was still approximately ten months away. When she completed rehab, Mr. Vandusen stated that Mother would still need proof of her participation in counseling to meet the requirements of her permanency plan so that DCS could verify Mother's progress and compliance with her mental health treatment. Mr. Vandusen explained that:

> [t]here's not been any documentation provided of attendance dates other than just a couple of sheets that she has given me, which document maybe one to two appointments. The appointment I took her to on July 11th, because I was there in person, but there's not been any documentation of confirmed appointments, prescriptions, other than she gave me a prescription sheet for CVS at one point in time. But there's not been any documentation from a provider documenting her participation.

Additionally, Mother had not followed up with her primary care physician, was not on her ADHD medication, and planned to avoid the ADHD medication altogether. This was despite the recommendation made after the mental health intake that she resume her medication and despite the recommendation being included in the permanency plan.

In regard to housing, Mr. Vandusen testified that he visited the trailer that Mother and Father lived in during June 2019. While he was not allowed inside the trailer, Mr. Vandusen testified that it did not appear appropriate from the outside, and that he observed broken windows in the structure and clutter around the yard. After Mother's eviction from this home, Mr. Vandusen provided Mother with information for supportive services and offered to help with applying for housing options. Mother obtained an apartment which Mr. Vandusen visited in January 2020, which he considered appropriate housing. However, he did not know how long she maintained that residence because she did not provide any proof of continued residence there, such as rent or utility receipts, and contact with her was difficult. He further testified that he received subsequent reports that she was staying at a hotel.

Mother continued to incur criminal charges while the children were in custody.[5] Mother was arrested for child abuse and neglect in July 2019 and shoplifting in December 2019. Most recently, in June 2020, Mother was arrested in a motel room for possession of

---

[5] Mother was previously arrested in June 2015 for harassment and in April 2018 for possession of drug paraphernalia.

heroin with intent to sell, possession of methamphetamine with intent to sell, simple possession of marijuana, and possession of drug paraphernalia. At the time of trial, Mother still faced those pending drug charges.

As for Mother's child support obligation, she made minimal payments and there was a warrant for her arrest for failure to pay child support at the time of trial. According to the child support orders, Mother was required to pay $25 for each child per month for a total of $100 per month. Mother made some child support payments from February 2019 to August 2019, but after August 2019 she did not make another payment until June 2020. In the child support orders, Mother's monthly gross income was listed as $500. Although Mr. Vandusen stated that he did not have verification of Mother's employment, Mother testified to working two jobs at one point during the pendency of this case. After entering rehab, Mother claimed she was unable to make child support payments. Mother worked forty hours per week while in rehab, but the checks went to the rehab center. When asked about child support, Mother stated that "I paid some of it, and [Father] had told me he had paid some, but I learned to find out he didn't. He didn't pay the part he said he was going to pay for me. And now that I'm in [rehab], I can't pay it."

With regard to visitation, Mother's first therapeutic supervised visitation occurred with Camelot Care Center in June 2019. Mr. Vandusen testified that DCS offered gas card assistance, but was "only able to do that once because the gas receipts weren't returned." Ms. Tabitha Glisson, who was an employee of Camelot Care Center, testified that Mother and Father came to visits impaired, often acted erratic, and sometimes slept during visitation. Ms. Glisson supervised twenty-one therapeutic visitations for the family and observed tension between Mother and Father during those visits. Ms. Glisson stated that:

> A main concern for me was the substance abuse because the behaviors were erratic sometimes. The attentiveness of the parents to the children, more importantly [Father's] attentiveness, was not there. The children would lash out and act – you know, act out in wanting attention from the parents. There were times where there was [sic] inappropriate conversations and just basically not being able to interject with the children's fighting sometimes.

Although there were some cancellations and Mother missed one visit because she was incarcerated, Mother's visitation record was fairly consistent until March 2020. At that time, in-person visitation ended because of COVID-19. The last in-person visitation occurred on March 17, 2020. DCS then had difficulty contacting Mother until June 2020. In July 2020, Mother entered rehab and DCS was able to resume visitations again. Because of COVID-19, visitation at the time of trial was done by video call. Mr. Vandusen stated that he observed Artemas and Abriel have some anxiety about visitation with Mother. Mr. Vandusen testified that during a visitation just before trial, Mother was very appropriate with the children and very engaging with the children. However, the children were reluctant to interact based on the behaviors he observed. Mr. Vandusen explained that:

The children were playing on their tablets. I had taken the tablets from the children so that they could interact with [Mother]. The children proceeded to get up and go to their beds, cover their heads, entire bodies. They were wollering [sic] around in the bed, didn't appear that they wanted to conversate. Abriel had got up, went to the bathroom, stayed in there for several minutes, came back out. Mom was still on the phone with Atticus. [Abriel] turned around and went back into the bathroom for another several minutes, and then he came out, went to the kitchen, came back in, and it – it was just seeing that the children were not wanting to interact based upon the behaviors I observed.

Throughout this case, the four children have been in foster care. Mr. Vandusen testified that when the children first came into custody, there was a bond between the children and the Mother. Yet at the time of trial, Mr. Vandusen did not believe the children and Mother had a significant bond and believed termination of Mother's rights was in their best interest. Further, Mr. Vandusen testified that he observed a bond between the four children and their respective foster parents, and that changing caregivers now would be detrimental for the children. Originally, Artemas, Abriel, and Atticus were placed in the home of their paternal aunt and uncle ("Aunt and Uncle"). They were then moved to a different foster home after a confrontation between the parents and Aunt and Uncle. However, Aunt and Uncle later approached DCS and indicated a willingness to try again. Since then, Aunt and Uncle have completed their adoption classes, submitted their paperwork, and are committed to adopt Artemas, Abriel, and Atticus. Aunt described the progress the children have made since moving to their home:

Artemas is playing basketball. Abe is merit roll – got merit roll. Atticus pretty much got merit roll. He's reading some now, Atticus is. They don't scream and holler as much. The only time they really act up is, like, after they've had a talk with their mom or their dad, and they will fight with each other and hit each other. And it just manifests. It's really angry. You know, it's like a trigger that sets off, just unbelievable. It's just unbelievable. But they have a really good routine, and when – as long as they stay on a routine, they do a lot better.

Mother testified that, as far as she knew, her relationship with Aunt was good. One of Mother's concerns was "that if [Aunt and Uncle] do adopt [Artemas, Abriel, and Atticus], and even though [she] do[es] stay sober and clean, that [Aunt and Uncle] won't allow [her] to have [her] children or see them. And [she] just want[s] to be a part of their life." Toward the end of her testimony, Mother added:

But if my boys are happy and they're getting along good, then I'm happy for them, and I want that to be what's – you know, that's what's best for them.

I just want to be a part of their lives and not just a part-time part of their lives on holidays and birthdays because that's even more confusing, I would think, you know. I want to be a part of their lives and what's going on with their daily everyday life . . . I want to be a family.

Aunt testified that Mother's parental rights should be terminated because Mother has not made progress and the children do not trust Mother. Aunt explained that the children do not trust Mother to take care of them or feed them, and had worried Mother might "get up and leave in the middle of the night." However, Aunt stated that she would be willing to work with Mother in the future to allow her to see the children again, but only if Mother was better and it was in the best interests of the children.

Mother admitted that she has a different relationship with her three oldest children compared to her relationship with her youngest child, Aye. Mother acknowledged that she was Aye's caregiver for only four months. Aye was in the home of his foster parents at the time of trial, after being moved there in September 2020. His foster parents are willing to adopt Aye. Mr. Vandusen testified that Aye's foster parents are providing for Aye's every need and their home would be a safe and loving one for Aye. At the time of trial, the goals of the permanency plan were adoption for Aye and either adoption or permanent guardianship for Artemas, Abriel, and Atticus.

On December 3, 2020, the juvenile court entered its finding of facts and conclusions of law which found that both parents' rights should be terminated based upon all six alleged grounds. The juvenile court also found that termination was in the best interests of the four children. On December 16, 2020, the juvenile court entered its order terminating Mother's parental rights.[6] Mother timely filed this appeal on January 14, 2021.

## II. ISSUES PRESENTED

Mother presents the following issue for review on appeal, which we have slightly restated:

1. Whether the juvenile court erred in concluding that the facts amounted to clear and convincing evidence that termination of Mother's parental rights was in the best interests of the children.

For the following reasons, we affirm the decision of the juvenile court.

## III. STANDARD APPLICABLE TO TERMINATION CASES

"A parent's right to the care and custody of her child is among the oldest of the

_____

[6] The juvenile court's order also terminated Father's parental rights.

- 10 -

judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated § 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated § 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors in Tennessee Code Annotated § 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552. Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008))

Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Grounds for Termination Against Mother

At the outset of this discussion, we note that the termination of Father's parental

rights is not a subject of this Opinion. On appeal, Mother presents the sole issue of whether the juvenile court erred in concluding that the facts amounted to clear and convincing evidence that termination of Mother's parental rights was in the best interests of the children. Mother's brief does not challenge the grounds for termination. However, "in an appeal from an order terminating parental rights [we] must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."[7] *Id.* at 525-26.

We begin our analysis with whether the facts amount to clear and convincing evidence that at least one of the statutory grounds for parental termination exists. DCS alleged six separate grounds for termination of Mother's parental rights. Those six grounds were the following: (1) abandonment by failure to support; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with the permanency plan; (4) persistent conditions; (5) severe child abuse; and (6) failure to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the children. The juvenile court found that DCS met its burden of proof on all six grounds for termination of Mother's parental rights. Thus, we must review the juvenile court's findings as to each ground for termination.

### 1. Abandonment by Failure to Support

A parent's rights may be terminated for abandoning his or her child. Tenn. Code Ann. § 36-1-113(g)(1). Under Tennessee Code Annotated section 36-1-102(1)(A), there are several alternative definitions of "abandonment." *See* Tenn. Code Ann. § 36-1-102(1)(A). The first of the alternative definitions of "abandonment" is:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . . either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

---

[7] Mother's counsel makes no argument on her behalf on any of the *six* grounds upon which the juvenile court terminated her parental rights. As we have previously observed, the practice employed by Mother's counsel "stretch[es] the supreme court's intention [in *In Re Carrington H.*] to its outer limit." *In re Mya V.*, No. M2016-02401-COA-R3-PT, 2017 WL 3209181, at *3 (Tenn. Ct. App. July 28, 2017). We have also previously "caution[ed] counsel against the use of our Supreme Court's holding in this manner." *In re Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *6 n.3 (Tenn. Ct. App. Nov. 6, 2020) (quoting *In re Yariel S.*, No. E2016-00937-COA-R3-PT, 2017 WL 65469, at *6 (Tenn. Ct. App. Jan. 6, 2017) (citing Tenn. Sup. Ct. R. 8, RPC 8(3) (providing that lawyers are obligated to act as a zealous advocate on behalf of his or her client))). We do the same here.

Tenn. Code Ann. § 36-1-102(1)(A)(i).[8]

In January 2019, Mother was ordered to pay $75 per month ($25 per child) in child support for Artemas, Abriel, and Atticus. In September 2019, Mother was ordered to pay $100 per month due to the addition of an additional $25 per month for her fourth child, Aye. In the child support orders for the children, Mother's monthly gross income was recorded as $500. As evidenced in her payment summaries, Mother made child support payments between February 2019 and August 2019. However, Mother did not make child support payments after August 2019 until June 2020. Mother testified that she worked two jobs at one point during this period. When asked at trial how much child support she paid, Mother stated that "I paid some of it, and [Father] had told me he had paid some, but I learned to find out he didn't. He didn't pay the part he said he was going to pay for me. And now that I'm in [rehab], I can't pay it."

On April 1, 2020, DCS petitioned to terminate parental rights of Mother to all four children. The relevant four-month period immediately preceding the filing of the petition was from December 1, 2019, to March 31, 2020. *See In re Jacob C. H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining the calculation of the four-month period). Mother's period of nonpayment after August 2019 until June 2020 both includes and well exceeds the four-month period immediately preceding the filing of the petition to terminate Mother's parental rights. Mother was made aware of the consequences of her failure to make court-ordered child support payments, as evidenced by her execution of the criteria and procedures for termination of parental rights. Even without knowledge of the consequences, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]" Tenn. Code Ann. § 36-1-102(1)(H). Furthermore, Mother did not claim that her failure to pay support during the relevant four-month period was not willful. Mother's argument that she could not pay child support while in rehab is inapplicable to the analysis of this ground because she entered rehab on July 17, 2020, which was after the filing of the petition and well after the relevant four-month period.

Because Mother did not pay child support for the relevant four-month period immediately preceding the filing of the petition to terminate her parental rights, Mother failed to support her children. Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of abandonment by failure to support.

## 2. Abandonment by Failure to Provide a Suitable Home

---

[8] Throughout our analysis, we use the versions of the statutes that were effective when the petition for parental termination was filed on April 1, 2020. "[T]here is ample authority that the amended version of the statute should not be applied to a termination petition that was filed prior to the statute's effective date." *See In re Michael W.*, No. E2019-00107-COA-R3-PT, 2020 WL 405473, at *5 (Tenn. Ct. App. January 23, 2020).

Under Tennessee Code Annotated section 36-1-102(1)(A), the second of the alternative definitions of "abandonment" is stated as:

> (ii)(a) The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
> (b) The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS must make "reasonable efforts" by utilizing its superior resources to help the parent find a suitable home. *In re Rahjada W.*, No. E2019-01798-COA-R3-PT, 2020 WL 2893434, at *5 (Tenn. Ct. App. June 3, 2020). To establish abandonment by failure to provide a suitable home, DCS must make these "reasonable efforts" during a four-month period following the removal of the child. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *In re Rahjada W.*, 2020 WL 2893434, at *5. "[T]he proof necessary to support termination under this ground need not be limited to any particular four-month period after removal. As long as the proof relates to 'a period of four (4) months following the removal, the ground may be established." *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)). Thus, our inquiry is not limited "to a period of four months *immediately* following the [children's] removal." *Id.*

We note that DCS's "efforts are deemed reasonable under the statute if its efforts 'equal or exceed the efforts of the parent . . . toward the same goal.'" *In re Dominic B.*, No. E2020-01102-COA-R3-PT, 2021 WL 774185, at *6 (Tenn. Ct. App. March 1, 2021) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c)). We also note that "the establishment of a suitable home entails considerations as to whether '[a]ppropriate care and attention' are given to the child at issue." *Id.* (quoting *In re Matthew T.*, No. M2015-00486-COA-

- 14 -

R3-PT, 2016 WL 1621076, at*7 (Tenn. Ct. App. Apr. 20, 2016)).

The children were removed from the home at two different times: Artemas, Abriel and Atticus were removed in November 2018 and placed in DCS custody after Atticus tested positive for methamphetamine and Aye was removed in April 2019 and placed in DCS custody after he tested positive for methamphetamine. The juvenile court found that "[r]easonable efforts were made to prevent the [three oldest] children's removal from the home including case management, a gas card, [and] offers for assistance in applying for insurance." The juvenile court found that "[i]t was reasonable to make no effort to maintain [Aye] in the home due to the circumstances of the family and the child." After a hearing in December 2018, the juvenile court adjudicated Artemas, Abriel, and Atticus dependent and neglected. The juvenile court adjudicated Aye dependent and neglected in June 2019.

Mother attempted to establish an independent home from the residence of Father's father after the removal of the three older children, but according to her testimony, she lost the home when she was evicted in the summer of 2019. Mr. Vandusen testified that he visited that home in June 2019 and, while he was not allowed inside, it did not appear suitable from the outside. He observed that the home had broken windows and clutter throughout the yard. After Mother lost that home, Mr. Vandusen provided her with information for supportive services and offered to help with applying for housing options. However, Mother chose to return to the home of Father's father. She testified that she remained there until October 2019, when Father's abuse escalated. At that time, she obtained an apartment furnished by her employer where she lived for a period of time. In January 2020, Mr. Vandusen visited that apartment and found it appropriate, but Mother did not provide Mr. Vandusen with any proof regarding her continued occupation of that home, such as rent or utility receipts. Mother admitted that she does not still have that apartment. Mr. Vandusen further testified that contact with Mother was difficult, but that he had received reports that she was "staying at a hotel at one point in time after that point." Mother testified that she was currently in in-patient rehab and acknowledged that she could not take custody of the children while in rehab.

Although Mother was in rehab at the time of trial, Mr. Vandusen made reasonable efforts to engage Mother regarding A&D services throughout the pendency of this case. Mr. Vandusen attempted to assist Mother in establishing a suitable home for the children by trying to help her address her substance abuse issues, but she was only accepting of the counseling and transportation. Mr. Vandusen provided information on residential treatment programs, IOP programs, had multiple conversations about treatment, and offered drug screens consistently at visitations. Mother remained in denial about her drug problem and admitted to using methamphetamine until June 28, 2020. There was "a lot of hostility and refusal to do drug screens and participate in treatment programs." Up until she entered rehab, Mother was uncooperative and unwilling to resolve her substance abuse issues in order to establish a suitable home for her children. Despite DCS's and Mr. Vandusen's efforts, Mother entered rehab only after she faced the possibility of

- 15 -

incarceration for her drug charges.

While Mother delayed her admittance into rehab, the four children were in DCS custody. Since the youngest child entered DCS custody in April 2019, almost one year had passed when the petition was filed to terminate Mother's parental rights. Consequently, this period well exceeds the four (4) months following the physical removal of the four children, even more so for the three oldest children who were placed in DCS custody in November 2018. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). During this period, we find that DCS and Mr. Vandusen made reasonable efforts to assist Mother in establishing a suitable home for the children, but Mother did not make reciprocal reasonable efforts to provide a suitable home and demonstrated a lack of concern for the children to such a degree that it appears unlikely that she would be able to provide a suitable home for the children at an early date. *Id.* Further, DCS's and Mr. Vandusen's "efforts equal[ed] or exceed[ed] the efforts of [Mother] . . . toward the same goal." *Id.*

For these reasons, Mother failed to provide a suitable home as required by this ground. Moreover, Mother could not have provided a suitable home for the children until she completed rehab ten months from trial. Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of abandonment by failure to provide a suitable home.

### 3. Substantial Noncompliance with Permanency Plan

A parent's rights may be terminated for substantial noncompliance with the statement of responsibilities in a permanency plan. Tenn. Code Ann. § 36-1-113(g)(2). In Tennessee, DCS is required to develop a permanency plan to help ensure each foster child receives adequate care. *In re Jamel H.*, No. 2014-02539-COA-R3-PT, 2015 WL 4197220, at *7 (Tenn. Ct. App. July 13, 2015). To terminate a parent's parental rights under this ground, the parent's noncompliance with the plan must be substantial and the plan's requirements must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547. "In the context of the requirements of the permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id*. at 548. "Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537.

Mother participated in the creation of the first permanency plan in December 2018, which was ratified by the trial court in January 2019. Subsequent plans were developed in April 2019, October 2019, and March 2020. The first permanency plan required Mother to do the following: complete a mental health intake and follow recommendations for any mental health services needed; complete an A&D assessment and follow recommendations

- 16 -

for treatment; submit to random drug screens and test negative consistently; sign a release of information with all providers to DCS so that DCS could monitor her progress and compliance; submit to a hair follicle drug screen by December 15, 2018; maintain contact with DCS and inform of any changes in residence and/or phone number; establish and maintain a stable residence that is safe and drug free for a minimum of four months and provide proof of residence to DCS in the form of rental agreement, rent receipts, and/or utility receipts; and participate in announced and unannounced visits conducted by DCS to assess the safety and appropriateness of the home. After Mother tested positive for methamphetamine and amphetamines on her April 2019 drug screen, the plan was amended to add that she was to complete inpatient A&D treatment. Additionally, a requirement was added that Mother would follow up with her primary care physician for medication management dealing with her ADHD and depression issues. On the October 2019 plan, Mother was required to resolve the legal charges for severe child abuse and not incur additional charges. We find that these requirements were "reasonable and related to remedying the conditions which necessitate[d] foster care placement" of the children. *In re Valentine*, 79 S.W.3d at 547.

Mr. Vandusen recognized that Mother had achieved some of the action steps in the permanency plans: completion of the A&D assessment, the psychological evaluation, and the mental health intake, participation in visitation with the children, and enrollment in inpatient rehab. However, after reasonable efforts to engage Mother regarding A&D services, Mother remained in denial about her drug problem. Up until she entered rehab in July 2020, Mother was not cooperative with DCS or Mr. Vandusen. Mr. Vandusen stated that "there was a lot of hostility and refusal to do drug screens and participate in treatment programs." Although Mother was enrolled in rehab at the time of trial, Mother admitted that the pending drug charges "pushed" her into rehab. Mother also admitted that she waited a significant period of time before entering rehab. The permanency plan recommended inpatient rehab in April 2019, but Mother did not enter rehab until July 2020.

During the life of this case, Mother was offered eighteen drug screens. Of those drug screens, five were positive, ten were refused, one was negative, and two were attempted but DCS was not able to contact Mother. Mother admitted that she used methamphetamine throughout the life of this case. Mother even stated that she believed her visitation with the children went better when she used methamphetamine versus when she was sober. Mother did not sign releases for all service providers so that DCS could monitor her progress and compliance. As noted above, Mother had not established a suitable drug-free home for the children and Mother did not provide Mr. Vandusen with rent or utility receipts as proof. She also did not permit Mr. Vandusen to have access to her home on at least one occasion. Despite her permanency plan's recommendation that she resume taking her ADHD medication, Mother stated that she was "completely off of the medication, [she was] completely sober, and [she felt] great." At the time of trial, Mother was not on medication and hoped to not be medicated at all. Mother had not followed up with her primary care physician for medication management and was not

- 17 -

seeing a doctor while in rehab.

Finally, Mr. Vandusen testified that "the most important thing that needed to be addressed was the substance abuse" and that "any action steps relating to that were most important[.]" Thus, the fact that Mother entered rehab to address her substance abuse issues weighed in her favor and we commend her for taking that step. Nevertheless, Mother's degree of noncompliance in waiting a significant period of time to enter rehab is measured against her. "Our concern is with [Mother]'s efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Daniel B., Jr.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *5 (Tenn. Ct. App. July 10, 2020) (citing *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009)). "'[O]utcome achievement is not the measure of compliance." *In re Mya V.*, 2017 WL 3209181, at *6 (quoting *In re B.D.*, 2009 WL 528922, at *8). Mother's fourteen-month delay in entering rehab necessarily means that there is a corresponding fourteen-month delay in completion of her rehab program. Unfortunately, as we have observed in similar cases, Mother's efforts were "too little, too late." *In re Michael*, No. M2015-02497-COA-R3-PT, 2016 WL 7486361, at *16 (Tenn. Ct. App. Oct. 6, 2016).[9]

Because these facts show that Mother was uncooperative with DCS, did not complete many of the action steps required by her permanency plan, and waited a significant period of time before entering rehab, Mother's noncompliance was substantial. Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of substantial noncompliance with the statement of responsibilities in a permanency plan.

### 4. Persistent Conditions

The fourth ground for termination at issue on appeal is commonly known as "persistent conditions." This ground for termination applies when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent of guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

---

[9] *See also In re Daymien T.*, 506 S.W.3d 461, 473 (Tenn. Ct. App. 2016); *In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *6 (Tenn. Ct. App. February 27, 2015); *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003).

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each element must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. We have stated that this ground applies "when, by court order, a 'child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months' as a result of a dependency and neglect petition." *In re Boston G.*, No. M2019-00393-COA-R3-PT, 2020 WL 2070399, at *6 (Tenn. Ct. App. Apr. 29, 2020); *see also In re D.V.*, No. E2018-01438-COA-R3-PT, 2019 WL 1058264, at *5 (Tenn. Ct. App. Mar. 6, 2019) ("The child must have been removed from the home or the physical or legal custody of a parent/guardian for a period of six (6) months by a court order entered following a petition alleging that the child is a dependent and neglected child.")

The four children were removed from Mother's and Father's home and entered DCS custody during separate dependency and neglect proceedings due to Atticus's and Aye's exposure to methamphetamine. Artemas, Abriel, and Atticus were removed from the home pursuant to a court order in November 2018. Aye was removed from the home in April 2019 pursuant to a court order. After a hearing in December 2018, the juvenile court adjudicated Artemas, Abriel, and Atticus dependent and neglected. The juvenile court adjudicated Aye dependent and neglected in June 2019. DCS filed the petition to terminate Mother's parental right in April 2020. As such, all four children were removed from the home for more than the six-month period required by the statute. Tenn. Code Ann. § 36-1-113(g)(3).

Mother admitted that she continued to use methamphetamine until her arrest for drug charges in June 2020. Ms. Glisson testified that Mother came to visits impaired and often acted erratic and sometimes slept during supervised therapeutic visitation. Mother even stated at trial that she believed visitation was better when she was using methamphetamine. Mother was offered eighteen drug screens throughout this case, in which she tested positive on five and refused ten. Mother tested negative for only one drug screen. Although Mother was in rehab at the time of trial, Mother waited at least fourteen months after the recommendation was made before entering rehab. During that time, Mother was hostile towards the idea of treatment and uncooperative with DCS and Mr. Vandusen. Mother entered rehab only after her pending drug charges "pushed" her in July 2020, despite her permanency plan recommending inpatient treatment in April 2019. At the time of trial, Mother could not assume custody of the children until she completed rehab

- 19 -

in August 2021, at the earliest. Upon release from rehab, she would have to begin the task of finding housing and support for herself and the children.

Thus, the conditions discussed here could not possibly be remedied until at least ten months after the trial. The continuation of the parent-child relationship would greatly diminish the children's chances of early integration into a safe, stable, and permanent home because Mother's substance abuse issues were still unresolved. The drug abuse which led to the children's removal continued to be an issue for Mother throughout the pendency of this case. Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on this ground.

### 5. Severe Child Abuse

A parent's rights may be terminated when "[t]he parent . . . has been found to have committed severe child abuse, as defined § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4). The juvenile court adjudicated Aye dependent and neglected in June 2019. That order also found that "Aye . . . was a victim of severe abuse by [Father] and [Mother] pursuant to Tennessee Code Annotated 37-1-102(b)(27)(A)(i)." The juvenile court made this finding after Aye completed a hair follicle drug screen and tested positive for methamphetamines.

The juvenile court's order found that Mother committed severe child abuse against her youngest child, Aye. As we have previously explained, "a trial court may rely on a prior court order finding severe child abuse and is not required to re-litigate the issue of severe abuse during the termination trial." *In re Alexis S.*, No. M2018-00296-COA-R3-PT, 2018 WL 6267180, at *10 (Tenn. Ct. App. Nov. 30, 2018); *see In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011); *State, Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005). Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of severe child abuse.

### 6. Failure to Manifest an Ability & Willingness to Assume Legal and Physical Custody or Financial Responsibility of the Children

Another ground for termination exists when "[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). Under this statutory ground, there are two elements necessary to prove. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The first element "places a conjunctive obligation on a parent . . . to manifest both

an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Accordingly, "clear and convincing proof that a parent . . . has failed to manifest <u>either</u> ability or willingness" satisfies the first element of this ground. *Id.* (adopting *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). A parent's ability to assume custody or financial responsibility is evaluated based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (citing *In re Ayden S.*, 2018 WL 2447044, at *7). It is common for parents to state that they are willing to assume custody or financial responsibility for their children. However, as we have explained, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). The second element requires the petitioner to establish that "placing the child in the [parent's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14); *see In re Neveah M.*, 614 S.W.3d at 677.

It was clear that Mother did not yet have the ability to assume custody at the time of trial. Mother admitted that she was unable to take custody of the children and did not have a suitable home for the children because she was in rehab. Artemas, Abriel, and Atticus have been in DCS custody since November 2018, while Aye has been in DCS custody April 2019. In that time, Mother failed to establish a safe and drug-free home and to adequately address her substance abuse and mental health issues. Mother was further unable to financially support the children. As for her willingness to assume custody, Mother stated in her testimony that she hoped to "restore her family." Mr. Vandusen testified that he never once doubted that Mother loved her children. Although Mother loved her children and testified in words as to her willingness to assume custody of the children, Mother failed to demonstrate through her actions that she was willing to assume custody or financial responsibility for the children.

Further, the record shows that placing the children in Mother's custody would have posed a risk of substantial harm to the physical or psychological welfare of the children. The children were in DCS custody and in their foster homes for a significant period of time. During that time, the evidence showed that the four children and their respective foster parents had developed a bond, the children were progressing, and changing caregivers now would be detrimental for the children. Removing them from that situation and placing them in Mother's custody when she did not have the ability to care for and house them would have posed a risk of substantial harm to the children.

Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of failure to manifest and ability and willingness to assume legal and physical custody or financial responsibility of the children.

### B. *Children's Best Interests*

We now review the juvenile court's findings as to whether termination of Mother's parental rights was in the best interests of the children. "When conducting the best interests analysis, [we] must consider nine statutory factors listed in Tennessee Code Annotated § 36-1-113(i)." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). Those factors are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878. We view the children's best interests from the children's perspective rather than the parent's perspective. *Id.* Finally, we "must consider all of the statutory factors, as well as any other relevant proof any party offers." *In re Gabriella D.*, 531 S.W.3d at 682. However, "a finding on each factor is not required." *In re Kaylene J.,* No. E2019-02122-COA-R3-PT, 2021 WL 2135954, at *18 (Tenn. Ct. App. May 26, 2021); *see In re Matthew T.*, 2016 WL 1621076, at *16 (citing *In*

*re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)).

### 1. Failure to Adjust Circumstance, Conduct, or Conditions as to Make it Safe and in the Children's Best Interests to be in the Home with Mother

The first statutory factor is whether Mother "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child[ren]'s best interest to be in the home of [Mother]." Tenn. Code Ann. § 36-1-113(i)(1). Mother argues in her brief that the juvenile court ignored most of her efforts throughout the case and completely detracted from the importance of Mother's active and ongoing participation in rehab. At the time of trial, Mother was enrolled in rehab, but Mother still had ten months until she would complete the program. At the time of trial, Artemas, Abriel, and Atticus had been in DCS custody for almost two years. Aye was in DCS custody for a year and a half, which was more than three-fourths of his life. Mother acknowledged that she was not able to take custody and take care of the children at the time of trial because of her enrollment in rehab. Mother was unable to say where she would be living after completing rehab. Mother admitted that she used methamphetamine after the children were removed and waited a significant period of time before stopping when she was "pushed" into rehab in July 2020.

The juvenile court's finding that this factor weighed in favor of termination did not ignore Mother's efforts and detract from the importance of her participation in rehab. The finding was an assessment of the reality that Mother does not have a home and cannot provide a home, at a minimum, until she completes her program. Even then, it is only a possibility that she could provide not only a home, but a home that is safe and in the best interests of the children. Mother delayed her enrollment into rehab even after reasonable efforts made by DCS and Mr. Vandusen. Prolonging their time in foster care for at least ten more months until Mother could complete her program was not in the best interests of the children. Further, Mother has not yet addressed her mental health recommendations. She admitted that she was not taking any of her previously-prescribed medications and was not under the care of a doctor. While we commend Mother for her current rehabilitation efforts, she has not made such an adjustment as to make it safe and in the children's best interests to be in the home with Mother. Thus, the first factor weighs in favor of termination.

### 2. Failure to Effect a Lasting Adjustment

The second factor is whether Mother "has failed to effect a lasting adjustment after reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(i)(2). As we have stated, the evidence shows that DCS consistently offered assistance to Mother to address mental health and A&D treatment. Mother admitted she was "pushed" into alcohol and drug rehab due to her pending drug charges. Mother argues in her brief that it is ultimately the decision to seek treatment that is paramount, not *what* influences the decision

- 23 -

or *how* one gets into treatment. However, the timing—the *when*—of Mother's decision to enter rehab is unfavorable.

Despite the recommendation in the second permanency plan that she attend inpatient treatment in April 2019, Mother did not enroll until July 2020. Mother testified that she had ignored rehab before the pending drug charges, but after returning to jail she decided she did not want to miss the opportunity. Before Mother entered rehab, Mr. Vandusen explained that "there was a lot of hostility and refusal to do drug screens and participate in treatment programs." Mother acknowledged that she waited a significant period of time before entering rehab. During that significant period of time, the children remained in foster care. Most unfavorably, Mother did not enter rehab despite DCS's petition to terminate her parental rights in April 2020. Despite those opportunities and despite facing the possibility of losing her children, Mother only entered rehab in July 2020 when she faced the pending drug charges for her arrest in June 2020.

Again, we commend Mother for her efforts to seek treatment. However, we must recognize the consequences of Mother's delay in seeking treatment. Because of her delay in seeking treatment, "we cannot say that Mother currently being 'on track' towards eliminating her addiction . . . renders a conclusion that she has . . . made a lasting adjustment to her conduct or circumstances." *In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *17 (Tenn. Ct. App. July 6, 2021). The facts show that Mother "failed to effect a lasting adjustment after reasonable efforts by [DCS] for such *duration of time* that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(i)(2) (2020) (emphasis added). The second factor weighs in favor of termination.

### 3. Maintenance of Regular Visitation or Other Contact

The third factor is whether Mother "has maintained regular visitation or other contact with the child[ren]." Tenn. Code Ann. § 36-1-113(i)(3). Ms. Tabitha Glisson, who was an employee of Camelot Care Center, testified that Mother and Father showed up for visits impaired and often acted erratic and sometimes slept during supervised therapeutic visitation. Ms. Glisson supervised twenty-one therapeutic visitations for the family and observed tension between Mother and Father during those visits. Ms. Glisson stated that she was concerned about the substance abuse because of erratic behavior sometimes, a lack of attentiveness of the parents to the children, and instances when there were inappropriate conversations. Mother attempted to maintain regular visitation with her children and took advantage of the DCS-arranged therapeutic visits. Mother routinely visited with her children even during the COVID-19 crisis and when visits became virtual, except when she was incarcerated or in treatment. Mother's visitation record was consistent up until March 2020. DCS then had difficulty contacting Mother from March 2020 to June 2020. However, DCS was able to resume visitations again when Mother entered rehab in July 2020. Mr. Vandusen testified that at visitation just before trial Mother was very appropriate with the children and very engaging with the children. The third factor weighs against

termination of Mother's parental rights.

### 4. Failure to Establish Meaningful Relationship

The fourth factor is "[w]hether a meaningful relationship has otherwise been established between [Mother] and the child[ren]." Tenn. Code Ann. § 36-1-113(i)(4). The four children were in DCS custody for a significant period of time. To reiterate, Artemas, Abriel, and Atticus were in DCS custody for almost two years at the time of trial. Aye was in DCS custody for a year and a half, and more than three-fourths of his life.

Mr. Vandusen testified that, based on his observations, he did not believe the children and Mother had a significant bond. Referring to the visitation just before trial, Mr. Vandusen testified that the children were reluctant to interact based on the behaviors he observed. Aunt testified that Mother has not made progress in her relationship with the children and the children do not trust Mother to take care of them. Mother even admitted that she has a different relationship with her three oldest children than she has with Aye because Aye was only in her care for four months. Although Mother did not establish a meaningful relationship with Aye, she did have a meaningful relationship with Artemas, Abriel, and Atticus prior to their removal. However, being separated for so long impacted their previously-existing bond. The fourth factor weighs in favor of termination.

### 5. Effect of a Change of Caretakers & Physical Environment

The fifth factor is "[t]he effect a change of caretakers and physical environment is likely to have on the child[ren]'s emotional, psychological and medical condition." Tenn. Code Ann. § 36-1-113(i)(5). Mr. Vandusen testified that there was a bond between the children and their respective foster parents, that changing caregivers would be detrimental to the health of the children, and that he witnessed reluctance and anxiety in the children's behavior in visits with Mother. Mr. Vandusen observed Artemas and Abriel have some anxiety about visitation with Mother. Furthermore, both of the respective sets of foster parents want to adopt the children. Aunt described the progress the children have made since moving into their home. She stated that the boys are doing well in school, with Artemas playing basketball and Abriel and Atticus making good grades. She also stated that their behavior had improved, with the exception of times they are angry and "act up" after speaking with their parents. The evidence demonstrates that there is a bond between the children and their respective caretakers, and that changing caretakers would be detrimental to the health, stability, and emotional and psychological condition of the children. The fifth factor weighs in favor of termination.

### 6. Brutality, Physical, Sexual, Emotional or Psychological Abuse, or Neglect

The sixth factor is "[w]hether the parent [], or other person residing with the parent [], has shown brutality, physical, sexual, emotional or psychological abuse, or neglect

toward the child[ren], or another child or adult in the family or household." Tenn. Code Ann. § 36-1-113(i)(6). Mother testified that she was a victim of domestic violence by both Father and his father. As for the children, Mother testified that Father and his father could be hateful to the children and that sometimes Father grabbed or jerked the children in a way Mother did not like. Mother stated that she would normally interfere and take the brunt of Father's violence so that the children would be spared. Mother's testimony demonstrates that the children experienced emotional and psychological abuse, and that the children observed domestic violence of Father toward Mother. Mother did not disclose that she was a victim of domestic violence until January 2020. At trial, it was unclear whether Mother and Father were still together, but Mr. Vandusen believed that they were not based on the information he had.

Further, all of the children were removed from the care of Mother (and Father) when they were placed in the custody of DCS. After a hearing in December 2018, the juvenile court adjudicated Artemas, Abriel, and Atticus dependent and neglected after Atticus tested positive for methamphetamines. The juvenile court adjudicated Aye dependent and neglected in June 2019. That order also found both Mother and Father had committed severe child abuse against Aye after he tested positive for methamphetamines. The sixth factor weighs in favor of termination.

### 7. Failure to Establish a Safe & Healthy Home, Continued Use of Methamphetamine, & Other Criminal Activity in the Home

The seventh factor is "[w]hether the physical environment of [Mother's] home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render Mother consistently unable to care for the child[ren] in a safe and stable manner." Tenn. Code Ann. § 36-1-113(i)(7). Mr. Vandusen testified that barriers still existed for Mother relating to her substance abuse issues, mental health treatment, residential stability, pending drug charges, and child support obligation. At the time of trial, Mother's graduation from rehab was still approximately ten months away. Mother testified that at the time she was unable to say where she would be living after completing rehab until she was a little further along in the program. Additionally, Mother still faced pending drug charges and there was also a warrant for her arrest for failure to pay child support at the time of the trial. The seventh factor weighs in favor of termination.

### 8. Mental and/or Emotional Status

The eighth factor is whether Mother's "mental and/or emotional status would be detrimental to the child[ren] or prevent [Mother] from effectively providing safe and stable care and supervision for the child[ren]." Tenn. Code Ann. § 36-1-113(i)(8). Mother completed an intake with Carey Counseling after Mr. Vandusen drove her to that appointment. However, Mother did not sign a release to allow DCS to obtain her

counseling records. Mother provided Mr. Vandusen paperwork showing that she attended a couple of appointments, but there is no proof in the record that she continued with her counseling. Further, Mother stopped taking her ADHD medication that she had been on for the majority of her life. Mother was in rehab and making progress at the time of trial, but her graduation date was still approximately ten months away. Mother was not seeing a doctor while in rehab, or taking any of her previously-prescribed medications. When she completes rehab, Mr. Vandusen stated that Mother would still need proof of her participation in counseling to meet the requirements of her permanency plan. There remains a great deal of uncertainty as to the state of Mother's mental health and the progress she had made in counseling. The eighth factor weighs in favor of termination.

### 9. Failure to Pay Child Support Consistently

The ninth factor is "[w]hether [Mother] has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101." Tenn. Code Ann. § 36-1-113(i)(9). As previously discussed, Mother made minimal payments and there was a warrant for her arrest for child support. According to the child support orders, Mother was required to pay $25 for each child per month, or a total of $100 per month. Mother made child support payments between February 2019 and August 2019. However, Mother did not make child support payments after August 2019 until June 2020, although she testified to having two jobs during a portion of this time. As also previously referenced, Mother testified that there was $30,000 recovered from the motel room where she was arrested in June 2020. After entering rehab, Mother claimed that she was unable to make payments. Mother worked forty hours a week while in rehab, but the checks went to the rehab center. Considering the length of Mother's period of nonpayment even prior to entering rehab, this factor weighs in favor of termination.

In conclusion, having considered the statutory factors and reviewed the trial court's findings, we find that there is clear and convincing evidence supporting the juvenile court's conclusion that termination of Mother's parental rights was in the best interests of the children.

## V. CONCLUSION

For the aforementioned reasons, we affirm the termination of parental rights. Costs of this appeal are taxed to the appellant, Jessica F., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE